IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| ALPESH D. DESAI, DO, P.A. D/B/A<br>HEIGHTS DERMATOLOGY<br><br>Plaintiff,<br><br>v.<br><br>STIMLABS, LLC<br>Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____<br><br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff Alpesh D. Desai, DO, P.A. d/b/a Heights Dermatology ("Heights Dermatology" or "Plaintiff"), by and through its undersigned counsel, hereby asserts this Complaint against Stimlabs, LLC ("Stimlabs" or "Defendant"):

## **INTRODUCTION**

1.      This matter arises from Stimlabs' misrepresentations regarding several of its products and Heights Dermatology's detrimental reliance on those misrepresentations.

2.      Plaintiff, Heights Dermatology, is a Texas-based chain of dermatology clinics, which emphasizes providing holistic, high-quality care for patients of all ages.

3.     In order to better serve its patients, Heights Dermatology purchased several wound care products (collectively, the "Products") from Defendant Stimlabs, a Georgia-based regenerative medicine manufacturer and supplier, from approximately 2020 to 2023.

4.     Heights Dermatology purchased the Products based on Stimlabs' marketing and claims that "Medicare always covered" the Products and that the Products were "100% approved."

5.     In reality, however, the Products were *not* covered by Medicare.

6.     Upon information and belief, Stimlabs was aware the Products were not covered by Medicare because, *inter alia*, it filed lawsuits against the United States Department of Health and Human Services ("HHS") related to Medicare coverage for the Products and had been warned by the Federal and Drug Administration ("FDA") that its marketing of the Products may have been unlawful. *See, e.g.,* (**Exhibit 1**, FDA Letter).

7.     Nevertheless, Stimlabs misrepresented the nature and characteristics of the Products to Heights Dermatology, who in turn detrimentally relied on those misrepresentations to purchase, use, and subsequently bill payors for the Products.

8.     As a result, Heights Dermatology has been subjected to audit(s) by Unified Program Integrity Contractors ("UPICs") contracted by the Centers for Medicare & Medicaid Services ("CMS"). Following the audit(s), the UPIC

determined Heights Dermatology had been overpaid on claims for reimbursement related to use of the Products. Thereafter, CMS recouped millions of dollars in overpayments. Heights Dermatology continues to face the risk of audits and recoupments from government and private payors.

9.      Heights Dermatology now brings the following causes of action against Stimlabs: Fraud (Count I); Fraudulent Concealment (Count II); Negligent Misrepresentation (Count III); Breach of Contract (Count IV); Breach of Warranty (Count V); and Unjust Enrichment (Count VI) (in the alternative to Counts IV and/or V). Heights Dermatology also seeks attorneys' fees (Count VII), costs, and punitive damages.

## PARTIES

10.      Heights Dermatology is a Texas professional association with its principal place of business in Harris County, Texas, and multiple locations throughout the State of Texas.

11.      Stimlabs is a limited liability company organized under the laws of the State of Georgia with its principal place of business in Fulton County, Georgia.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because, upon information and belief, complete diversity of citizenship exists

between Heights Dermatology and Stimlabs, and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

13.     Prior to the filing of this Complaint, Heights Dermatology made reasonable efforts and conducted a good faith investigation to discover the members of Stimlabs.

14.     Based on Heights Dermatology's reasonable investigation, it is believed that one or more of Stimlabs' members resides in or about Fulton County, Georgia, and is a citizen of the State of Georgia. The citizenship of Stimlabs' other members, if any, is not public information.

15.     Accordingly, upon information and belief, none of Stimlabs' members is a citizen of Texas, and therefore none of Stimlabs' members is a citizen of the state in which Heights Dermatology is a citizen.

16.     This Court has personal jurisdiction over Stimlabs as, among other things, it is organized under the laws of the State of Georgia, has its principal place of business in Fulton County, Georgia, and it committed a tortious act or omission within the State of Georgia, as discussed in greater detail herein.

17.     Georgia state law applies to the claims brought herein.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Stimlabs is a resident of Georgia with its principal place of business in Fulton County, Georgia.

## BACKGROUND

### *Heights Dermatology and Stimlabs*

19.     As mentioned above, Heights Dermatology is a Texas-based, state-wide dermatology practice that emphasizes providing holistic, high-quality care for patients of all ages.

20.     Stimlabs is a regenerative medicine company, with a focus on wound care and surgical applications.

21.     Upon information and belief, Stimlabs was incorporated in or about 2015.

22.     The relationship between Heights Dermatology and Stimlabs began in 2020 when Stimlabs' sales director, Catherine Sullivan, visited Heights Dermatology in-person and represented that Heights Dermatology could use Stimlabs' products for wounds created by surgical excision in dermatology.

23.     Ms. Sullivan represented to Heights Dermatology that Stimlabs' products worked better than the products being used by Heights Dermatology at the time and that they were reimbursable by payors such as Medicare.

24.     Based on the representations of Ms. Sullivan and others associated with Stimlabs, Heights Dermatology purchased approximately 45,000 units of Stimlabs' Products over the course of nearly two years.

25.     The average cost per unit of the Products was approximately $282.00.

26. Over the course of the business relationship, Heights Dermatology purchased approximately **$12 million** worth of Stimlabs Products based on Stimlabs' misrepresentations and concealment.

27. These Products were purchased from Stimlabs on a "pay as we go method" and such purchases were subsequently represented by invoices from Stimlabs.

28. Heights Dermatology reasonably believed, based on Stimlabs' representations, that the Products could be used to prevent patients—particularly those from underserved communities—from having to endure radical surgical repairs, exposure to radiation or chemotherapy, and other aggressive forms of treatment.

29. Heights Dermatology ultimately ended its relationship with Stimlabs after undergoing a UPIC audit and learning that Stimlabs' Products were not covered by Medicare or other payors.

*Applicable FDA Regulations and Requirements*

30. The FDA regulates the processing or manufacturing, distribution, and marketing of drugs, biologics, and medical devices.

31. The FDA also regulates the processing or manufacturing, distribution, and marketing of cells, tissues, and cellular tissue-based products ("HCT/Ps").

32.     Between 2001 and 2004, the FDA promulgated a series of regulations, codified in 21 C.F.R. Part 1271, which created a new risk-based regulatory framework for the regulation of HCT/Ps under the authority of Section 361 of the Public Health Service Act, 42 U.S.C. Ch. 6A.

33.     HCT/Ps are defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d).

34.     Some, but not all, HCT/Ps are eligible for regulation solely under Part 1271. HCT/Ps solely regulated under Part 1271 are not regulated as drugs, biologics, or medical devices, do not receive FDA approval, and are not required to undergo a premarket review by the FDA. *See* 21 C.F.R. § 1271.1 *et seq.*

35.     In order for an HCT/P to be regulated solely under Part 1271, it must meet four criteria: (1) the product must be minimally manipulated; (2) intended for homologous use only; (3) not be combined with any other article, with some minor exceptions; and (4) not have a systemic effect or be dependent on metabolic activity. 21 C.F.R. § 1271.10(a).

36.     The FDA defines "minimal manipulation" for structural tissue as "processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, replacement." 21 C.F.R. § 1271.3(f)(1).

37.     The FDA defines "homologous use" as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c).

38.     According to the FDA, the homologous-use requirement is intended to guard against "promotion of an HCT/P for an unproven therapeutic use." 66 Fed. Reg. 5447, 5458 (Jan. 19, 2001).

39.     Because FDA premarket review or approval is not required, it is the responsibility of each manufacturer or tissue processor to determine prior to marketing whether their HCT/Ps meet the criteria under Part 1271. To assist manufacturers and processors with this, the FDA issued a guidance document. *See* U.S. FOOD & DRUG ADMIN., REGULATORY CONSIDERATIONS FOR HUMAN CELLS, TISSUES, AND CELLULAR AND TISSUE-BASED PRODUCTS: MINIMAL MANIPULATION AND HOMOLOGOUS USE (July 2020), https://www.fda.gov/media/109176/download [https://web.archive.org/web/20200722202754/https://www.fda.gov/media/109176/download].

40.     The FDA determines whether an HCT/P meets the criteria of Part 1271 based on the product's *intended* use, which includes not just how the product is labeled but how the product is advertised and promoted to health care providers and patients. *See id.* at 5.

41.     Specifically for amniotic membrane products, the FDA considers homologous use to be any function where the product serves as a selective barrier to protect against the environment. *See id.* at 19.

42.     In contrast, marketing amniotic membrane products as supporting bone regeneration, wound healing, or reducing scarring or inflammation is *not* homologous use and not permissible under FDA regulations. *See id.*

43.     Accordingly, the FDA has issued warning letters to companies promoting HCT/Ps for purposes such as bone regeneration, wound healing, or reducing scarring or inflammation. *See, e.g., Warning Letter: BioLab Sciences, Inc.*, U.S. FOOD & DRUG ADMIN. (Aug. 23, 2022), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/biolab-sciences-inc-621465-08232022 [https://web.archive.org/web/20220921165955/https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/biolab-sciences-inc-621465-08232022].

44.     While the FDA does not regulate the practice of medicine and its decisions are not dispositive of Medicare coverage or reimbursement, its regulations regarding HCT/Ps are relied upon by CMS to determine whether use of a particular HCT/P is reasonable and necessary and therefore covered by Medicare.

### *The Stimlabs Products*

45.     Upon information and belief, the Products that Heights Dermatology purchased from Stimlabs included, but may not be limited to, the following:

a.      Revita, which has a Q code of Q4180, is an amniotic membrane allograft. Upon information and belief, Stimlabs began marketing Revita in 2017.

b.      Corplex, which has a Q code of 4232, is a human umbilical cord tissue allograft. Upon information and belief, Stimlabs began marketing Corplex in 2020.

c.      Corplex P, which has a Q code of Q4231, is a human umbilical cord extracellular matrix. Upon information and belief, Stimlabs began marketing Corplex P in 2020.

d.      Cogenex, which has a Q code of Q4229, is a fenestrated dehydrated complete human placental membrane allograft.

46.     During some or all of the relevant time period, Stimlabs marketed the Products solely as HCT/Ps under Part 1271, and therefore did not have FDA approval or clearance.

47.     Upon information and belief, Stimlabs ceased marketing Corplex in or about 2021.

48.     Upon information and belief, as of the date of filing this Complaint, Revita and Cogenex continue to be marketed by Stimlabs as HCT/Ps.

49.     Upon information and belief, Corplex P is now marketed by Stimlabs as a medical device, despite initially being marketed as an HCT/P from approximately 2020 to 2024. Stimlabs received FDA clearance for Corplex P as a medical device in February 2024 for the management of wounds, including pressure ulcers, diabetic ulcers, and chronic vascular ulcers. (**Exhibit 2**, Corplex P FDA Clearance).

### *FDA Letter to SimLabs*

50.     On or about March 10, 2021, Mary A. Marlarkey, the then-Director of the FDA's Office of Compliance and Biologics Quality's Center for Biologics Evaluation and Research, issued a letter to the CEO of Stimlabs, John Daniel ("FDA Letter"). (**Exhibit 1**, FDA Letter).

51.     Letters such as the FDA Letter are commonly referred to as "Untitled Letters" or "It Has Come to Our Attention Letters," where the FDA gives the violating entity an opportunity to respond and correct the action before the FDA initiates an official enforcement action. *See, e.g., Letters to Industry*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/medical-devices/industry-medical-devices/letters-industry (last updated Feb. 20, 2024)

[https://web.archive.org/web/20250222104713/https://www.fda.gov/medical-devices/industry-medical-devices/letters-industry].

52.     The FDA Letter stated that Stimlabs "appear[ed] to be offering regenerative medicine products to treat certain diseases or conditions," and that such products were generally regulated by the FDA under the Public Health Service Act as HCT/Ps. Alternatively, the FDA Letter noted such products could also be regulated as biological products, drugs, and/or devices, and may require pre-market review. (**Exhibit 1**, FDA Letter).

53.     The FDA Letter further noted that "[i]n order to lawfully market an HCT/P that is also a biological product and a drug, a valid biologics license must be in effect," and that "[s]uch licenses are issued only after a showing of safety and efficacy for the product's intended use." *Id.*

54.     Upon information and belief, Stimlabs did not have a valid biologics license, or any other approval or clearance, prior to marketing Revita, Corplex, or Corplex P, to treat certain diseases or conditions, and therefore Stimlabs' marketing of the Products was unlawful.

55.     As discussed above, a requirement for marketing an HCT/P without approval is the product must be intended for homologous use (i.e., wound coverings). Therefore, any marketing by Stimlabs that the Products could "treat

certain diseases or conditions," as opposed to functioning just as wound coverings, was outside the permissible scope for HCT/Ps.

*Stimlabs' Misrepresentations*

56.     Throughout Stimlabs' relationship with Heights Dermatology, Stimlabs repeatedly made false and/or misleading statements about their products and whether the Products were reimbursable by Medicare and other payors.

57.     For example, on or about March 16, 2021, Heights Dermatology sent Stimlabs' sales director, Catherine Sullivan, a text message regarding a Medicare patient that Heights Dermatology wanted to treat with Revita. Ms. Sullivan responded, "Yes you can use it!" When Heights Dermatology sought to confirm, Ms. Sullivan stated, "Yes! Always!" and "Medicare always covered." (**Exhibit 3**, March 16, 2021 Sullivan Text Message).[1]

58.     Ms. Sullivan also repeatedly represented to Heights Dermatology via text message that Stimlabs' Products had "100%" approval. *See, e.g,* (**Exhibit 4**, April 2021 Sullivan Text Messages).

59.     Similarly, on or about May 6, 2021, Heights Dermatology texted Ricky Palmer, Stimlabs' West Area Vice President, with concerns that certain Stimlabs

---

[1] Any redactions in exhibits to this Complaint concern information that is either irrelevant or highly sensitive, such as patients' protected health information ("PHI"). If required, Heights Dermatology will disclose these documents without redactions later in this proceeding pursuant to a sufficiently comprehensive protective order.

products would not be covered by Medicare after May 2021. Mr. Palmer responded, "Not true" and stated Stimlabs products were good to go. (**Exhibit 5**, May 6, 2021 Palmer Text Message).

60. In addition to misrepresentations directly made by Stimlabs to Heights Dermatology, Stimlabs also made several misrepresentations in the marketing materials for their products.

61. Namely, upon information and belief, Stimlabs marketed its products as treating certain diseases or conditions, even though a requirement for marketing an HCT/P without approval is that the product must be intended for homologous use (i.e., solely as a wound covering).

62. Similarly, Stimlabs suggested or stated that its products could be used to reduce pain, inflammation, scarring, and wound healing. These claims are considered disease claims by FDA and therefore would be outside the permissible scope for marketing HCT/Ps, such as the Products.

63. For example, during negotiations for the Products in or about Summer 2021, Stimlabs sent Heights Dermatology a marketing slide deck ("Slide Deck") for Revita and another one of its Products, Ascent (Q4213). (**Exhibit 6**, Stimlabs Slide Deck).

64. The Slide Deck claimed that the Products could, among other things, "optimize wound healing and minimize scarring," reduce inflammation and pain,

accelerate angiogenesis and cell proliferation, modulate scar formatting, and act as "an anti-inflammatory and antibacterial," an analgesic, "an inhibitor of fibrosis and scar," and "a promoter of epithelialization." *Id.*

65.    These representations in the Slide Deck marketed the Products for non-homologous uses, which was impermissible under the applicable FDA regulations and requirements.

66.    Heights Dermatology relied on these representations of how the Products could be used in not only purchasing the Products but also for the manner in which the Products were used on Heights Dermatology's patients.

67.    The examples discussed above are only some of the misrepresentations made by Stimlabs and do not constitute an exhaustive list.

### The UPIC Audit(s)

68.    On or about August 29, 2022, Heights Dermatology received a letter from Qlarant Integrity Solutions, LLC ("Qlarant"), the UPIC contracted by CMS for Texas (the "UPIC Letter"). This was the first time Heights Dermatology received any notice that the products may not be covered by Medicare.

69.    The UPIC Letter informed Heights Dermatology that Qlarant had reviewed a universe of claims with paid dates from April 23, 2019, through April 22, 2022, to determine whether the services billed for by Heights Dermatology and paid

for by Medicare were reasonable and necessary and that all other requirements for coverage were met (the "Audit").

70.     In sum, Qlarant calculated a total extrapolated overpayment amount of $4,804,935.49.

71.     Of this total extrapolated overpayment amount, it is believed that the claims for the Products constituted approximately 64% of the total claims at issue and approximately **$3,075,158.71** of the overpayment.

72.     Upon information and belief, claims for allografts and other products similar to the Products at issue have increasingly been subject to audits and overpayment demands because they are deemed to be non-homologous and investigational, such that they fall outside the regulatory scheme for homologous use described in 21 C.F.R. § 1271.3(c); require separate FDA approval as a drug, device, or biological; and are not reasonable and necessary for wound treatment.

73.     As a result of the Audit, CMS recouped payments made to Heights Dermatology for claims related to the Products.

74.     Heights Dermatology appealed the findings of the Audit through the Medicare appeals process but ultimately received an unfavorable decision by an Administrative Law Judge with the Office of Medicare Hearing and Appeals on or about February 1, 2024.

75.     Since receiving the UPIC Letter, Heights Dermatology has expended, and will continue to expend, significant resources in responding to and appealing the findings of the Audit, as well as any other audits that have occurred, may occur, and or will occur.

76.     In addition to duping Heights Dermatology into purchasing the Products at issue, Stimlabs' continuous and active concealment of the fact that the Products were not covered by Medicare was designed to deter Heights Dermatology from bringing claims against Stimlabs. Thus, the earliest any applicable statute of limitations would have begun to run was on or about the date Heights Dermatology received the UPIC Letter—i.e., August 29, 2022.

77.     As a result of Stimlabs' misconduct, Heights Dermatology has suffered significant damages and continues to suffer damages.

## CAUSES OF ACTION

## COUNT I — FRAUD

78.     Heights Dermatology incorporates by reference and re-alleges Paragraphs 1 through 77 as if fully stated herein.

79.     Stimlabs made several misrepresentations to Heights Dermatology regarding the material facts of the Products' approved uses, approval status, and Medicare coverage, despite knowing that those representations were false, as discussed in greater detail in the Background section of this Complaint.

80.     Stimlabs knew that whether the Products were reimbursable by Medicare and/or other payors was a material fact upon which Heights Dermatology relied in deciding to purchase and use the Products because Heights Dermatology repeatedly asked Stimlabs whether the Products were reimbursable.

81.     The aforementioned fraudulent representations by Stimlabs were made with the intention to induce Heights Dermatology to purchase and use the Products so that Stimlabs could profit.

82.     Heights Dermatology justifiably relied on Stimlabs' fraudulent representations when purchasing the Products and would not have purchased or used the Products but for the fraudulent representations.

83.     As a direct and proximate result of Stimlabs' fraud, Heights Dermatology was subject to recoupment of millions of dollars' worth of claims regarding the Products, thereby causing damages.

84.     There is also a foreseeable likelihood that additional audits and/or recoupments, whether by the government or other payors, may occur.

85.     Heights Dermatology has further incurred and will continue to incur costs, including but not limited to attorneys' fees, in responding to the UPIC audit and recovering damages caused by Stimlabs.

86.     By reason of the foregoing, Stimlabs is liable for damages in an amount to be determined at trial, plus pre-judgment and post-judgment interest, the principal

paid and interest on any amounts recouped, punitive damages to extent available under Georgia law, costs, attorneys' fees to the extent available under the law, and all other relief, both legal and equitable, to which Heights Dermatology may be entitled.

## COUNT II — FRAUDULENT CONCEALMENT

87.     Heights Dermatology incorporates by reference and re-alleges Paragraphs 1 through 77 as if fully stated herein.

88.     During negotiations regarding the Products and throughout the relevant dealings, Stimlabs knowingly concealed the material fact that the Products were not approved for certain uses and not reimbursable by Medicare.

89.     Upon information and belief, Stimlabs was aware at all times relevant to this Complaint that the Products were not approved or covered by Medicare because, *inter alia*, it filed lawsuits against HHS related to Medicare coverage for the Products (which Heights Dermatology was reasonably not then aware of) and had been warned by the FDA that its marketing of the Products was potentially unlawful.

90.     Stimlabs further knew that whether the Products were approved or reimbursable was a material fact upon which Heights Dermatology relied in deciding to purchase the Products because Heights Dermatology repeatedly asked Stimlabs whether the Products were approved or reimbursable.

91.     The aforementioned fraudulent omissions by Stimlabs were made with the intention to induce Heights Dermatology to purchase and use the Products.

92.     Heights Dermatology justifiably relied on Stimlabs' representations and omissions when purchasing the Products and would not have purchased and used the Products but for the fraudulent concealment.

93.     Stimlabs had a duty to disclose the Products were not approved for certain uses or covered by Medicare because of, among other things, the particular circumstances of this case.

94.     Specifically, the particular circumstances of this case gave rise to a duty to disclose because Stimlabs intentionally omitted that the Products were not approved or reimbursable with the goal of deriving a benefit (i.e., purchase of the Products by Heights Dermatology and subsequent profit), knew that Heights Dermatology only purchased and used the Products because it believed the Products were covered by Medicare, and because unless Stimlabs had disclosed that the Products were not covered, Heights Dermatology would not have been able to discover via reasonable means that the Products were not covered in time to prevent the massive losses Heights Dermatology has since suffered.

95.     As a direct and proximate result of Stimlabs' fraudulent concealment, Heights Dermatology was subjected to recoupment of millions of dollars' worth of claims regarding the Products, thereby causing damages.

96. There is also a foreseeable likelihood that additional audits and/or recoupments, whether by the government or other payors, may occur.

97. Heights Dermatology has further incurred and will continue to incur costs, including but not limited to attorneys' fees, in responding to the UPIC audit and recovering damages caused by Stimlabs.

98. By reason of the foregoing, Stimlabs is liable for damages in an amount to be determined at trial, plus pre-judgment and post-judgment interest, the principal paid and interest on any amounts recouped, punitive damages to extent available under Georgia law, costs, attorneys' fees to the extent available under the law, and all other relief, both legal and equitable, to which Heights Dermatology may be entitled.

## COUNT III — NEGLIGENT MISREPRESENTATION

99. Heights Dermatology incorporates by reference and re-alleges Paragraphs 1 through 77 as if fully stated herein.

100. Stimlabs negligently supplied false information to Heights Dermatology regarding the Products characteristics, including the Products' approved uses, approval status, and Medicare coverage.

101. Heights Dermatology foreseeably and reasonably relied on the false information provided by Stimlabs and purchased the Products from Stimlabs and used them on patients.

102.    Because of Height Dermatology's foreseeable and reasonable reliance on Stimlabs' false information, Heights Dermatology was audited by the UPIC, and Medicare payments made to Heights Dermatology for claims regarding the Products were, are being, and/or will be recouped, thereby causing damages and economic injuries.

103.    There is also a foreseeable likelihood that additional audits and/or recoupments, whether by the government or other payors, may occur.

104.    Heights Dermatology has further incurred and will continue to incur costs, including but not limited to attorneys' fees, in responding to the UPIC audit(s) and recovering damages caused by Stimlabs.

105.    By reason of the foregoing, Stimlabs is liable for damages in an amount to be determined at trial, plus pre-judgment and post-judgment interest, the principal paid and interest on any amounts recouped, costs, attorneys' fees to the extent available under the law, and all other relief, both legal and equitable, to which Heights Dermatology may be entitled.

## COUNT IV — BREACH OF CONTRACT

106.    Heights Dermatology incorporates by reference and re-alleges Paragraphs 1 through 77 as if fully stated herein.

107.   Stimlabs and Heights Dermatology entered in a contract(s), whereby Stimlabs agreed to provide certain approved and covered products, and Heights Dermatology agreed to pay for those products.

108.   Heights Dermatology paid Stimlabs, as agreed; however, Stimlabs did not provide Heights Dermatology with the agreed-upon approved and covered products, thereby breaching the contract(s).

109.   As a direct and proximate result of Stimlabs' breach of the contract(s), Heights Dermatology paid approximately $12 million without receiving the approved and covered products that it contracted for. Additionally, as a direct and proximate result of Stimlabs' breach of the contract(s), Heights Dermatology was subject to recoupment of millions of dollars' worth of claims regarding the Products, thereby causing damages.

110.   There is also a foreseeable likelihood that additional audits and/or recoupments, whether by the government or other payors, may occur.

111.   Heights Dermatology has further incurred and will continue to incur costs, including but not limited to attorneys' fees, in responding to the UPIC audit and recovering damages caused by Stimlabs.

112.   By reason of the foregoing, Stimlabs is liable for damages in an amount to be determined at trial, plus pre-judgment and post-judgment interest, the principal paid and interest on any amounts recouped, costs, attorneys' fees to the extent

available under the law, and all other relief, both legal and equitable, to which Heights Dermatology may be entitled.

## COUNT V — BREACH OF WARRANTY

113. Heights Dermatology incorporates by reference and re-alleges Paragraphs 1 through 77 as if fully stated herein.

114. There existed a contract(s) between Stimlabs and Heights Dermatology regarding the purchase of the Products.

115. Stimlabs' guarantees to Heights Dermatology that the Products were "100% approved" and always covered by Medicare constituted express warranties as they were affirmed and understood by Heights Dermatology as fact.

116. Stimlabs' express warranties to Heights Dermatology formed the basis of the bargain between Stimlabs and Heights Dermatology.

117. There further existed implied warranties of merchantability that the Products sold by Stimlabs were reasonably fit for their ordinary purpose and met industry standards — i.e., that the Products were approved, covered by Medicare and met all applicable FDA regulations and other requirements.

118. Stimlabs breached its express and implied warranties as, *inter alia*, the Products were not approved, covered by Medicare, and did not meet all applicable FDA regulations and other requirements.

119.   As a direct and proximate result of Stimlabs' breach of its express and implied warranties, Heights Dermatology paid approximately $12 million without receiving the Medicare-reimbursable products that it contracted for. Additionally, as a direct and proximate result of Stimlabs' breach of its express and implied warranties, Heights Dermatology was subject to recoupment of millions of dollars' worth of claims regarding the Products, thereby causing damages.

120.   There is also a foreseeable likelihood that additional audits and/or recoupments, whether by the government or other payors, may occur.

121.   Heights Dermatology has further incurred and will continue to incur costs, including but not limited to attorneys' fees, in responding to the UPIC audit and recovering damages caused by Stimlabs.

122.   By reason of the foregoing, Stimlabs is liable for damages in an amount to be determined at trial, plus pre-judgment and post-judgment interest, the principal paid and interest on any amounts recouped, costs, attorneys' fees to the extent available under the law, and all other relief, both legal and equitable, to which Heights Dermatology may be entitled.

## COUNT VI — UNJUST ENRICHMENT
### (In the Alternative to Counts IV and/or V)

123.   Heights Dermatology incorporates by reference and re-alleges Paragraphs 1 through 77 as if fully stated herein.

124.    Stimlabs induced and/or encouraged Heights Dermatology to purchase the Products by, *inter alia*, supplying false information to Heights Dermatology regarding the approval status and Medicare coverage of the Products, as discussed in greater detail in throughout this Complaint.

125.    Heights Dermatology provided Stimlabs with a benefit (i.e., payment for the Products) with the expectation that Stimlabs would be responsible for providing products that were approved and covered by Medicare.

126.    Stimlabs knew of the benefit being bestowed upon by Heights Dermatology and either affirmatively chose to accept the benefit or failed to reject it, despite failing to provide Heights Dermatology with approved or covered products, and was therefore unjustly enriched.

127.    By reason of the foregoing, Stimlabs is liable for damages in an amount to be determined at trial, plus pre-judgment and post-judgment interest, the principal paid and interest on any amounts recouped, costs, attorneys' fees to the extent available under the law, and all other relief, both legal and equitable, to which Heights Dermatology may be entitled.

## COUNT VII — ATTORNEYS' FEES AND COSTS

128.    Heights Dermatology incorporates by reference and re-alleges Paragraphs 1 through 77 as if fully stated herein.

129.    Stimlabs has acted in bad faith and been stubbornly litigious in their refusal to fulfill their obligations and to resolve this matter without the need for litigation, thus causing Heights Dermatology unnecessary trouble and expense, such that Heights Dermatology is entitled to recover the costs and expenses of litigation, including attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Enter judgment in its favor and against Defendant with respect to Counts I through VII, both collectively and individually, for all damages suffered or incurred by Plaintiff, including pre-judgment and post-judgment interest as provided by law, the principal paid and interest on any amounts recouped , attorneys' fees and other costs of this action, in an amount to be more specifically shown at trial;

2.    Award punitive damages to extent available under Georgia law against Defendant with respect to Counts I and II, in an amount to be more specifically shown at trial;

3.    Award Plaintiff such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

A trial by twelve (12) jurors is hereby demanded on all counts and causes of action so triable, to the extent authorized by law.

Dated:      May 9, 2025        Respectfully Submitted,

**POLSINELLI PC**

By: <u>*/s/ Ellen H. Persons*</u>
Ellen H. Persons
1201 West Peachtree St., NW
Suite 1100
Atlanta, GA 30309
Telephone: (404) 253 6048
Email: epersons@polsinelli.com
Georgia Bar No. 930133

Stephen D. Bittinger
*Motion Pending for Pro Hac Vice*
177 Meeting Street, Suite 400
Charleston, SC 29401
Telephone: (440) 823-0664
Facsimile: (854) 444-7056
Email: sbittinger@polsinelli.com

*Counsel for Plaintiff*